NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 11-2151
_____

UPPER FREEHOLD REGIONAL BOARD OF EDUCATION

v.

*T. W.; M. W., o/b/o T.W.,
Appellants

*Dismissed pursuant to Clerk's order of December 22, 2011
_____

Appeal from the United States District Court
for the District of New Jersey
(D.C. Civil No. 3-09-cv-01847)
District Judge: Honorable Joel A. Pisano
_____

Argued May 22, 2012

Before: RENDELL, FUENTES and HARDIMAN, <u>Circuit</u> <u>Judges</u>

(Opinion Filed: September 7, 2012)
_____

Pedro De Oliveira, Esq.    **[ARGUED]**
Mark W. Friedman, Esq.
Debevoise & Plimpton
919 Third Avenue
41st Floor
New York, NY  10022

Denise Lanchantin Dwyer, Esq.
5 Duxbury Court
Princeton Junction, NJ  08550
  *Counsel for Appellants*

Cherie L. Adams, Esq.      **[ARGUED]**
Adams, Stern, Gutierrez & Lattiboudere
1037 Raymond Boulevard
Suite 710
Newark, NJ  07102

Paul C. Kalac, Esq.
Parker McCay
1009 Lenox Drive
Building Four East, Suite 102A
Lawrenceville, NJ  08648
 *Counsel for Appellee*

———————

OPINION OF THE COURT
———————

RENDELL, <u>Circuit Judge</u>.

This is an appeal from the District Court's reversal of a state administrative law

judge's (ALJ) award of tuition reimbursement for plaintiffs in an Individuals with

Disabilities in Education Act ("IDEA") case.  We will vacate the judgment below and

remand.

**I.  Background**

T.W. is a child with learning disabilities.  His parents, along with the school

district of Upper Freehold (the "District"), developed an individualized education plan

("IEP") for the 2006-07 school year that called for T.W. to split his school days between

the District's preschool and the "Project Child" preschool in the Mercer County Special

Services School District.  Although T.W. turned four early in the 2006-07 school year, he

was placed in a classroom at Project Child with three-year olds who would turn four in

2

the calendar year 2007. T.W.'s birthday is in September 2002, shortly before the October 1st date that the District uses as a cut-off for class years. Therefore, if T.W. was placed in a classroom based on his date of birth, he would be one of the youngest students. In his Project Child classroom, by contrast, he was one of the oldest students.

The current dispute relates to a disagreement between T.W.'s parents and the District about T.W.'s education for the 2007-08 school year. Prior to a June 15, 2007 meeting of T.W.'s IEP team, the District provided T.W.'s parents with a draft IEP, proposing that T.W. be placed in kindergarten the following fall and receive certain additional services and therapies. At the June 15 meeting, the parents urged that T.W. be placed in preschool for another year. The meeting adjourned without agreement on an IEP. Another meeting was scheduled for June 29, 2007, but never took place. The District asserts that T.W.'s parents cancelled the meeting, whereas the parents contend that they merely requested a postponement to give a psychologist working with T.W. time to complete her full report.

By letter dated June 29, 2007, the District sent T.W.'s parents an amended IEP for the 2007-08 school year, again calling for T.W.'s placement in kindergarten but adding additional supports and services recommended by a team of Yale researchers that analyzed T.W. at his parents' behest. The cover letter enclosing the amended IEP stated "[y]ou have 15 days to respond." (A2109.)

T.W.'s parents responded by letter dated July 3, 2007, stating that "the document purporting to be an IEP was generated without our participation" and that, because the parties had not discussed their "unresolved issues" at an IEP meeting, "the document [the

3

parents] received could not constitute the district's formal proposal." (A2110.) The letter concluded by stating, "[w]e look forward to your response." (A2110.)

On July 12, 2007, T.W.'s parents filed a request for mediation and a due process hearing. They claim they filed their petition when they did because they believed that, under New Jersey law, the District's June 29 IEP placing T.W. in kindergarten would have gone into effect unless they requested mediation or a due process hearing within 15 days of the IEP proposal. *See* N.J.A.C. § 6A:14-2.3(h)(3).

The parties met again in August 2007 to try to resolve their dispute. At that meeting, the parents presented the district with a letter from T.W.'s developmental pediatrician, Dr. Anna Baumgaertel, explaining that she recommended another year of preschool for T.W. so that he could "work on his significant social deficits." (A2124.) The meeting concluded without an agreement.

In September 2007, T.W.'s parents unilaterally placed him as a regular student in the Project Child preschool program. On September 11, 2007, they advised the District by letter that they would be making the placement immediately and that they were "unable to wait ten business days to make the placement [pursuant to 20 U.S.C. § 1412(a)(10)(C)(iii)(I)(bb)] because to do so would cause [T.W.] to suffer severe harm." (A2125.)

In the beginning of the 2007-08 school year, T.W. did not receive one-on-one services and therapies at Project Child. However, on November 19, 2007, T.W.'s parents and Project Child agreed on an educational plan for T.W. that called for him to receive

4

additional services and be in a smaller classroom setting. The District did not participate in the making of this plan.

An ALJ hearing was conducted over eleven days in 2008 and early 2009. The ALJ thoroughly described the evidence presented in a 54-page opinion. He found both the District's witnesses and T.W.'s expert witnesses credible. He found that "[i]f placed in kindergarten in the 2007-08 school year, T.W. would do 'fine academically,' but it could increase his social awkwardness and withdrawal . . . . [F]or the 2007-08 school year placement in *kindergarten* pursuant to an IEP with supports and services was necessary for T.W. to have a FAPE." (A58 (emphasis added).) The ALJ noted that when T.W. was placed in Project Child's full-day preschool program for the 2007-08 school year, he "did not receive the therapies and/or related services that the [District] would have provided pursuant to the draft IEP and I find that this placement in Project Child did not provide T.W. with a FAPE." (A58.) However, the ALJ found that "[o]n November 19, 2007, without inviting the [District] educators to participate in an IEP meeting [T.W.'s parents] and Project Child agreed to an IEP for T.W." (A59.)

The District argued that it offered an IEP for the 2007-08 school year that would have provided a FAPE and that T.W.'s parents refused and/or failed to participate meaningfully in the IEP-development process, so their claim for reimbursement should therefore be dismissed. The ALJ's complete response follows:

> [D]uring the summer of 2007 the parties had reached an impasse: the petitioners would not agree to an IEP that provided for placement in kindergarten for the 2007-08 school year and, consistent with the findings of fact, placement in kindergarten would not have provided a FAPE. On the other hand, the placement of T.W., a disabled child, in Project Child as

5

a regular student and without an IEP also did not provide him with a FAPE. T.W. did not have an IEP until after November 19, 2007, and the unilateral placement did not provide a FAPE until after November 19, 2007. Consequently, the [District] cannot be ordered to reimburse [T.W.'s parents] for the unilateral placement before that time. However, the [District] is responsible for the reimbursement for the unilateral placement for the period after November 19, 2007, until the end of the 2007-08 school year.

(A63.) The ALJ made no specific finding as to whether the District's draft amended IEP offered a FAPE or whether the IEP provided sufficient "supports and services" to make the placement in kindergarten a FAPE. (*See* A58 (ALJ opinion) ("[F]or the 2007-08 school year placement in kindergarten pursuant to an IEP with supports and services was necessary for T.W. to have a FAPE.").)

The parties appealed to the District Court for the District of New Jersey and submitted cross-motions for judgment on the record. Relying on our decision in *C.H. v. Cape Henlopen Sch. Dist.*, 606 F.3d 59 (3d Cir. 2010), the District Court held that the parents were not entitled to reimbursement. The District Court concluded that the parents' actions "deprive the Court of the ability to determine whether the District proposed an appropriate IEP." (A8.) Furthermore, the District Court denied reimbursement on "equitable grounds, as provided for in 20 U.S.C. § 1412(a)(10)(C)(iii)," saying that the parents "did not provide adequate notice to the District of their unilateral withdrawal of T.W. from the public placement," and that their "conduct in delaying, cancelling, or refusing to set up additional meetings with the IEP team substantially precluded any possibility that the District could timely develop an appropriate IEP for T.W." (A9.)

## II. Standard of Review

On appeal from an ALJ's determination in an IDEA case, the district court is to "give due weight and deference" to the ALJ's findings and consider the ALJ's factual findings to be prima facie correct. *D.S. v. Bayonne Bd. of Educ.*, 602 F.3d 553, 564 (3d Cir. 2010); *see also Bd. of Educ. of Hendrick Hudson Ctrl. Sch. Dist. v. Rowley*, 458 U.S. 176, 206 (1982) ("[D]ue weight shall be given to [state administrative] proceedings."). According "due weight" to the ALJ's findings means that the district court has an obligation "to consider—although not necessarily to accept—the administrative fact findings." *Carlisle Area Sch. v. Scott P.*, 62 F.3d 520, 529 (3d Cir. 1995) (citing *Oberti ex rel. Oberti v. Bd. of Educ. of Borough of Clementon Sch. Dist.*, 995 F.2d 1204, 1219 (3d Cir. 1993)). The district court "must *independently* review the evidence adduced at the administrative proceedings and can receive new evidence." *Oberti*, 995 F.2d at 1219. Ultimately, the district court must "'make an independent determination based on a preponderance of the evidence.'" *Id.* (quoting *Geis v. Bd. of Educ.*, 774 F.2d 575, 583 (3d Cir. 1985)). A district court "should defer to the hearing officer's findings based on credibility determinations unless the non-testimonial, extrinsic evidence in the record would justify a contrary conclusion or unless the record read in its entirety would compel a contrary conclusion." *Carlisle*, 62 F.3d at 529.

We review a district court's findings of fact for clear error and exercise plenary review over the legal standards the district court applies and the legal conclusions it reaches. *Bayonne Bd. of Educ.*, 602 F.3d at 564. Under a clear error standard of review, "we accept the District Court's ultimate factual determinations unless 'that determination

7

either (1) is completely devoid of minimum evidentiary support displaying some hue of credibility, or (2) bears no rational relationship to the supportive evidentiary data.'" *N.J. Retail Merchants Ass'n v. Sidamon-Eristoff*, 669 F.3d 374, 390 (3d Cir. 2012) (quoting *Krasnov v. Dinan*, 465 F.2d 1298, 1302 (3d Cir. 1972)). Where parents allege that "the district court failed to observe its own proper scope of review, we must determine whether the district court erred in its interpretation or application of the law governing the administrative review process, a question over which we exercise plenary review." *Carlisle*, 62 F.3d at 526 (citing *Louis W. Epstein Family P'ship v. Kmart Corp.*, 13 F.3d 762, 765-66 (3d Cir. 1994)).

### III. Discussion

The IDEA authorizes tuition reimbursement for parents who unilaterally decide to place their child in an out-of-district school if the IEP proposed by the school district failed to offer the child a FAPE and the placement the parents chose was proper under the IDEA. *Sch. Comm. of Burlington v. Dep't of Educ. of Mass.*, 471 U.S. 359, 370 (1985); *Florence Cty. Sch. Dist. Four v. Carter*, 510 U.S. 7, 15 (1993). The District Court failed to analyze these issues and instead relied on *Cape Henlopen* as the basis for denying tuition reimbursement to T.W.'s parents. This was error.[1] *Cape Henlopen* presented a very unique situation, and the holding in that case simply cannot be applied once the parties have been working toward formulating an IEP, and then reach an impasse. In

---

[1] We note that the ALJ did not have the benefit of our decision in *Cape Henlopen*, which was issued after his decision in this case. Even so, we do not believe that affects our analysis. As explained below, we believe that the behavior of T.W.'s parents was quite different from the conduct of the parents in *Cape Henlopen*.

8

*Cape Henlopen*, the petitioners alleged that the school district committed a *procedural* violation of the IDEA when it failed to have an IEP in place for their child on the first day of school. 606 F.3d at 68-69. We noted that this failure was a result of the parents' decision to delay an IEP team meeting until after classes had begun. *Id.* at 69. We therefore "decline[d] to hold that a school district is liable for procedural violations that are thrust upon it by uncooperative parents." *Id.* Here, in contrast, the parents do not complain that the school district failed to timely implement an IEP. Rather they complain that the *substance* of the proposed IEP, which was developed after meetings and correspondence between the parties, did not provide a FAPE because it called for T.W. to attend kindergarten, not preschool, for 2007-08. The alleged problem with the IEP was not that it could not be developed due to "uncooperative parents." *Id.* Rather, the problem was that the IEP offered would place T.W. in kindergarten for the school year 2007-08.[2] The parents' disagreed with that proposal, resulting in what the ALJ characterized as an "impasse." (A63.) To say that *Cape Henlopen* would apply to totally bar parents from reimbursement after negotiations reached an impasse is to fault them for

---

[2] While the dissent believes that the procedural versus substantive distinction makes little difference, we disagree. The reason the parents in *Cape Henlopen* complained of a procedural violation—the failure of the school district to have an IEP in place on the first day of school—was that there was no IEP offered, because the parents refused to attend meetings or permit testing required in order for an IEP to be prepared. *C.H. v. Cape Henlopen Sch. Dist.*, 606 F.3d 59, 64 (3d Cir. 2010) ("[T]he Parents refused to give the District permission to conduct a speech and language evaluation of C.H., which was necessary in order to develop his IEP."). No mention is made in *Cape Henlopen* of any proposed program, or the parents' wishes, if any, regarding schooling. We correctly held that where the parents essentially prevented the formulation of the IEP, the school district could not be held responsible for the procedural violation.

9

failing to agree to whatever the school district presents, whether justified or not.[3] Here,

the District Court erred when it abbreviated its analysis based on the parents' conduct and

failed to determine whether the District's proposed IEP was appropriate. It should have

considered the substance of the District's most recent proposed IEP and determined if it

met the IDEA's substantive requirements. *See Rowley*, 458 U.S. at 203 (holding that a

state satisfies the IDEA's requirement to offer FAPE "by providing personalized

instruction with sufficient support services to permit the child to benefit educationally

from that instruction"); *Bayonne Bd. of Educ.*, 602 F.3d at 556 ("Although a state is not

required to supply an education to a handicapped child that maximizes the child's

potential, it must confer an education providing 'significant learning' and 'meaningful

benefit' to the child." (quoting *Ridgewood Bd. of Educ. v. N.E.*, 172 F.3d 238, 247 (3d

Cir. 1999))). We will remand for the District Court to address that issue.

Additionally, we find error in the District Court's denial of reimbursement on

equitable grounds based on the parents' conduct. Again, the District Court's reliance on

---

[3] The dissent suggests that so long as a school district presents its proposed IEP as a "draft" rather than "final proposal," a parent who unilaterally places her child in private school has "short-circuited the IEP-development process" and can be barred from tuition reimbursement based on *Cape Henlopen*. (Dissenting op. at 3-4 & n.4.) This cannot be. Under the dissent's proposal, school districts could force parents into perpetual negotiations and effectively gut a parents' right to tuition reimbursement for a unilateral placement. The IDEA does not permit school districts to hold parents hostage merely by styling an IEP as a "draft" subject to the possibility of revision, however remote. Parents who make unilateral placements for their children surely take a risk that they will later be found to have pulled out of negotiations prematurely. *Cf. Sch. Comm. of Burlington v. Dep't of Educ. of Mass.*, 471 U.S. 359, 373-74 (1985) (noting that parents who make unilateral placements "do so at their own financial risk"). However, we disagree with our dissenting colleague that school districts can unilaterally dictate how long negotiations must continue by deciding when to call their proposals "final."

*Cape Henlopen* was misplaced. The ALJ had not considered the parents to be unreasonable or to have refused to work with the District to develop an IEP. Instead, the ALJ recounted all of the meetings and correspondence between the parties and then characterized the situation as an "impasse." (A63.) This clearly connotes an inability of both sides to agree, not the arbitrary refusal of one side to come to the table. We agree. Our review of the record leads us to conclude that the District Court's finding "that the Parents' conduct in delaying, cancelling, or refusing to set up additional meetings with the IEP team substantially precluded any possibility that the District could timely develop an appropriate IEP for T.W. and provide the necessary services to him" was clearly erroneous. (A9.) Unlike the parents in *Cape Henlopen*, T.W.'s parents did not "disregard[] their obligation to cooperate and assist in the formulation of an IEP." 606 F.3d at 72. The record clearly indicates that the parents participated in the IEP development process and tried to work with the District to develop an IEP. However, the parties reached an impasse based on the parents' insistence on preschool and the District's insistence on kindergarten. Denial of reimbursement based on this aspect of the parents' conduct was improper.

In discussing its alternative holding to deny reimbursement on equitable grounds, the District Court noted that T.W.'s parents did not provide adequate notice to the District, pursuant to 20 U.S.C. § 1412(a)(10)(C)(iii), of their intent to withdraw T.W. from the District's school. The IDEA states that failure to give the statutorily required notice can justify the "reduc[tion] or deni[al]" of a reimbursement award. 20 U.S.C. § 1412(a)(10)(C)(iii)(I). However, it is unclear to us whether the District Court's equitable

11

reduction was tainted by its erroneous determination that T.W.'s parents acted unreasonably in the IEP development process. Therefore, on remand, after the District Court determines whether T.W.'s parents are eligible for tuition reimbursement, it may examine to what extent any reimbursement award may be equitably reduced based on § 1412(a)(10)(C)(iii)(I). If the District Court reaches this issue on remand, it should consider the equities, including the parents' argument that delay in placing T.W. in Project Child would have caused him severe harm and the extent to which the District was prejudiced by receiving late notice of the parents' decision. The District Court may, of course, take additional evidence on this issue or remand the case to the ALJ for further fact-finding.

In sum, the District Court erroneously short-circuited the required analysis by applying our ruling in *Cape Henlopen* to deny T.W.'s parents tuition reimbursement. In so doing, the District Court did not reach the real issue before it: whether the IEP proposed by the District offered T.W. a FAPE, and, if not, whether the placement at Project Child was proper under the IDEA.[4] *Burlington*, 471 U.S. at 370; *Florence*, 510 U.S. at 15. The District Court must engage in this analysis on remand.

---

[4] The District Court stated that "[b]ecause the November [19, 2007] plan [drawn up by T.W.'s parents and Project Child] was developed in the absence of the District, it was legal error for the ALJ to conclude that it was an IEP" and that "[t]herefore, the ALJ could not find that T.W.'s placement at the outside program was proper." (A6-7.) While it is true that the educational plan was not technically an IEP, this fact alone does not prevent the parents from receiving tuition reimbursement. The IDEA allows parents of disabled children to be reimbursed for expenditures on private special education if (1) the IEP calling for placement in a public school was inappropriate and (2) the private placement desired by the parents was proper under the Act. *Florence*, 510 U.S. at 15. To satisfy the second step of this test, parents seeking reimbursement for the unilateral

We note that there is a paucity of reasoning in the ALJ's opinion regarding these crucial analytical issues. The ALJ's opinion states that "placement in *kindergarten* pursuant to an IEP with supports and services was necessary for T.W. to have a FAPE," but does not explain why kindergarten placement with the support services provided for in the revised IEP—including all of the recommendations proposed by the Yale researchers—was insufficient to provide a FAPE. (A58 (emphasis added).)[5] The ALJ embraces the opinion of Dr. Baumgaertel (who never saw the District's proposed IEP), yet never indicates why the opinions of the District's experts (whom he credited) were rejected. If the District Court so desires, it may request a remand to the ALJ so that this aspect of its opinion can be expanded.

Accordingly, we will vacate the judgment below and remand for further proceedings consistent with this opinion.

---

placement of their child in an out-of-district school need not show that the out-of-district school provided their child with an IEP; they need only show that the alternative placement was "proper." *Id.* This does not require that the out-of-district placement conform to the statutory requirements of an IEP. *Id.* at 13 (noting that the requirement that an IEP must be designed by a representative of the local educational agency "do[es] not make sense in the context of a parental placement").

[5] At oral argument in this case, counsel for the parents suggested that the use of the word "kindergarten" in the above-quoted language was a typographical error. This argument was not made in appellants' briefs and we are reluctant to infer that a key portion of the ALJ's opinion—the only portion discussing what would be required in 2007-08 to give T.W. a FAPE—was a mere typographical error.

HARDIMAN, *Circuit Judge*, dissenting.

My disagreement with the majority's effort to distinguish controlling precedent necessitates this respectful dissent.

I

In *Cape Henlopen*, the disabled child attended private school for the 2005–06 school year, and under a settlement agreement the school district reimbursed the parents for most of the cost of that schooling. 606 F.3d at 63. During that year, the mother and the school district met to develop an individualized education program (IEP) under which the child would return to the public school the following year. *Id.* The meeting was cut short due to a scheduling conflict and, after the mother indicated she was unavailable for several weeks, the school district offered to continue the meeting approximately three weeks later, which was five days into the school year. *Id.* The mother noted a conflict but tentatively agreed to that date. *Id.*

On the first day of school, before the scheduled date for the continued meeting, the parents "unilaterally chose[] to have [the child] begin classes at" private school. *Id.* at 64. The next day, the parents filed a due-process request and thereafter refused to attend the scheduled meeting. *Id.* The state hearing panel and the district court both found against the parents because the school district did not deny the child a free appropriate public education (FAPE) and because the parents had unduly inhibited the school district from providing an IEP. *Id.* at 64–65. We affirmed, stating:

> Although the IEP was not completed in the first meeting, it was the Parents and not the District who delayed the continuation of that meeting until after the start of classes, and ultimately terminated the process by filing a due

process request. Like the court in [*MM ex rel. DM & EM v. School District of Greenville County*, 303 F.3d 523 (4th Cir. 2002)], we decline to hold that a school district is liable for procedural violations that are thrust upon it by uncooperative parents.

*Id.* at 69. As the child never enrolled in the public school, there was no "specific evidence of an educational deprivation." *Id.* In other words, the parents' decision to remove their child from the school before a final IEP had been offered deprived this Court of the opportunity to evaluate whether the school district would have provided a FAPE. *See id.* at 69–70.

The application of *Cape Henlopen* to the parents' conduct in this case is straightforward. In both cases, the parents participated in a preliminary IEP meeting regarding the upcoming school year. They also left that initial meeting without resolution or a final IEP proposal, thwarted the district's attempt to hold an additional meeting,[1] and then turned to litigation.[2]

---

[1] The parents in this appeal claim that the District never sought another meeting, (Reply Br. 4–5), but the record indicates otherwise. The District wrote to the parents: "It is [the District's] firm and consistent desire that we reach agreement on a least restrictive, free appropriate public education for [T.W.] Please contact [the District] so that we may continue to move forward in developing an Individualized Education Plan for [T.W.]." **(App. 2111.)**

[2] The parents also contend that they filed the due-process petition in order to protect their rights under New Jersey law. Specifically, they claim that under N.J. Admin. Code § 6A:14-2.3(h), the District's June 29 letter triggered a fifteen-day window after which the District could have implemented the IEP if they had not filed a request for mediation or a due-process hearing. I am unconvinced that New Jersey law allows an IEP to be unilaterally implemented in this way. *See* N.J. Admin. Code § 6A:14-2.3(a)(2), (c) (mandating parental consent prior to finalization and adoption of an IEP). But even if

2

The majority distinguishes *Cape Henlopen*, correctly identifying that the parents there alleged a procedural violation of the IDEA, whereas here a substantive claim has been brought. In my view, that is a distinction without a difference. To obtain reimbursement, a plaintiff alleging a procedural violation still must show that the school district's "violation can meaningfully be said to have '[i]mpeded the child's right to a FAPE' or 'caused a deprivation of [an] educational benefit.'"[3] *Id.* at 66–68 (alterations in original) (quoting 34 C.F.R. § 300.513(a)(2)). Put more simply, even procedural claims that seek compensatory relief require proof of a substantive violation of the IDEA.

Consequently, it makes little sense to limit *Cape Henlopen*'s rule to procedural claims. The *Cape Henlopen* principle—that parents may not recover compensatory education or tuition reimbursement under the IDEA where they have short-circuited the IEP-development process—applies with equal force to procedural and substantive IDEA lawsuits.[4]

---

it does, *Cape Henlopen* requires parents to continue the IEP-development process even after availing themselves of procedural safeguards. *See Cape Henlopen*, 606 F.3d at 72 ("The stay-put provision [in 20 U.S.C. § 1415(j)] does not . . . excuse the Parents, who based their complaint on the absence of an IEP, from continuing to meet with the District to rectify the perceived wrong.").

[3] If the plaintiff chooses not to prove substantive harm, he "may only seek injunctive relief for prospective compliance." *Cape Henlopen*, 606 F.3d at 66 (citing *P.P. ex rel. Michael P. v. W. Chester Area Sch. Dist.*, 585 F.3d 727, 738 (3d Cir. 2009)).

[4] This principle is useful only where the parents terminate the interactive process while the IEP is in "draft" form, as was the case here and in *Cape Henlopen*. If the District had set forth a final proposal, or if the District's own obstinacy had caused a

3

The majority's disagreement arises from its misreading of *Cape Henlopen*, from which it incorrectly concludes that the parents there impeded the school district from initiating the IEP-development process. In defending its procedure-versus-substance distinction, the majority writes that in *Cape Henlopen*, "the parents refused to attend meetings or permit [the] testing required" for IEP development. Maj. Typescript at 9 n.2. In fact, the requisite educational evaluation occurred and the mother attended an initial IEP meeting. 606 F.3d at 63. In addition, the majority asserts that in that case "[n]o mention is made . . . of any proposed" IEP or the specifics of the parents' requested educational supports. Maj. Typescript at 9 n.2. This reasoning seeks to distinguish *Cape Henlopen* by assuming the nonexistence of certain facts regarding the details of the IEP-development process simply because they were not included in the opinion. But even in this attempt, the majority misinterprets the case. We noted in *Cape Henlopen* that the IEP meeting the parents attended "concluded before C.H.'s IEP was finalized." 606 F.3d at 63. The use of the word "finalized" implies that there was a draft proposal. We can likewise infer that, because the mother attended the IEP meeting but placed her child in private school, the family and the school district failed to reach an agreement regarding the child's education. In sum, the facts in *Cape Henlopen* mirror the facts of this case.

---

break-down in communication, the parents would have been under no continuing obligation to schedule or attend further meetings. *See Cape Henlopen*, 606 F.3d at 69 (distinguishing *Knable ex rel. Knable v. Bexley City Sch. Dist.*, 238 F.3d 755 (6th Cir. 2001)). Thus, I do not advocate, as the majority suggests I do, that "school districts [can] force parents into perpetual negotiations." Maj. Typescript at 10 n.3.

4

Accordingly, I would hold that the District Court properly applied *Cape Henlopen*.

II

A second ground for affirmance exists in this case. The majority interprets the equitable-reduction provision of the IDEA to not allow a denial of the ALJ's award as applied to the parental conduct at issue here. I see it differently. The IDEA allows a district court to reduce or deny any award, *id.* at 71, if: (1) the parents failed to reject the school district's placement and indicate their intent to make a private placement "at the most recent IEP meeting that the parents attended"; (2) they did not provide written notice of their intent to remove the child ten days prior to the removal; or (3) there is a "judicial finding of unreasonableness with respect to actions taken by the parents." 20 U.S.C. § 1412(a)(10)(C)(iii)(I), (III). There is no question that the parents left the first and only IEP meeting without rejecting the placement. Nor is there any doubt that the parents did not provide the requisite notice. Thus, the denial of the ALJ's award, like the District Court's "judicial finding of unreasonableness," was not an abuse of discretion.

For these reasons, I respectfully dissent.